IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 07-0183 (RMC) |
| | ) |
| ACCENT MASONRY LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MOTION FOR ENTRY OF DEFAULT JUDGMENT
AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF**

Plaintiffs, by their attorneys, and in accordance with Federal Rule of Civil Procedure 55(b)(2), move this Court to enter a default judgment in favor of the Plaintiffs and against Defendant in the amount of $32,465.21 on the ground that default has been entered against Defendant for failure to answer the Complaint of Plaintiffs. This motion is supported by the Declarations of David F. Stupar, attached hereto as Exhibit A, and Ira R. Mitzner, attached hereto as Exhibit B. The certificate of the Clerk of this Court declaring Defendant in default is attached hereto as Exhibit C. A copy of the Complaint filed by Plaintiffs is attached hereto as Exhibit D.

## FACTS

Plaintiffs, John Flynn, et al., filed the Complaint in this case on January 25, 2007. On February 18, 2007, Accent Masonry LLC ("Accent Masonry") was served with the Summons and Complaint. Defendant has failed to file an Answer to the Complaint. On August 6, 2007, default was entered by the Clerk of this Court against Defendant, Accent Masonry.

## ARGUMENT

Rule 55 of the Federal Rules of Civil Procedure provides that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk shall enter the party's default and "the party entitled to a judgment by default shall apply to the court therefor." Defendant has failed to answer the Complaint, default has been entered by the Clerk, and Plaintiffs are entitled to judgment. Accordingly, Plaintiffs' motion for a default judgment should be granted. *See, e.g., Trustees of the Local 306, United Ass'n. Health & Welfare Fund v. Am. Testing & Inspection, Inc.*, No-88-2274-OG, 1988 WL 134942, *1 (D. D.C. Nov. 30, 1988) (entering default judgment where "defendant has failed to respond at any step of these proceedings or otherwise enter an appearance"); *Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 901 (11th Cir. 1990) (affirming entry of default judgment as "[n]either the text of the Federal Rules, nor judicial interpretation placed in the rules by the Federal Courts contemplate that a party may totally ignore pleadings and notices it receives").

DSMDB-2342781v01

## CONCLUSION

For the foregoing reasons, a default judgment in favor of Plaintiffs and against

Defendant in the amount of $32,465.21 should be entered.

Date: Nov. 2, _____, 2007        Respectfully submitted,

By _____

Ira R. Mitzner (D.C. Bar No. 184564)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC 20006
(202) 420-2234

Counsel for Plaintiffs

3

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al.,                              )<br>                                                )<br>                    Plaintiffs,                   )<br>                                                )<br>          v.                                     )<br>                                                )<br>ACCENT MASONRY LLC,                              )<br>                                                )<br>                    Defendant.                   )<br>                                                ) | Civil Action No. 07-0183 (RMC) |

**DECLARATION OF DAVID F. STUPAR IN SUPPORT
OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

Pursuant to 28 U.S.C. § 1746, I, DAVID F. STUPAR, hereby declare as follows:

1.      I am the Executive Director of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund") and am also an authorized representative to effect collections on behalf of the Bricklayers & Allied Craftworkers International Health Fund ("IHF"), and the International Masonry Institute ("IMI") as specified in the General Collection Procedures and Special Collection Procedures for IHF of the Central Collection Unit ("CCU") of the Bricklayers and Allied Craftworkers ("Collection Procedures" or "Procedures") (attached at Tabs 1 and 2). I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.      The IPF is a multiemployer employee benefit plan subject to ERISA. The IPF is governed by an equal number of employer-appointed and union-appointed Trustees, pursuant to the Taft-Hartley Act. Benefits under the plan are funded by contributions from participating employers.

2318834.01

3.     The Fund provides pension and other benefits to employees who work in the construction industry under contracts negotiated between Bricklayer local unions and employers. Pursuant to these contracts, the employers are obligated to make contributions to the Fund in order to fund the benefits provided to the beneficiaries.  The Trustees of the Fund have a fiduciary duty under ERISA to collect delinquent employer contributions, and the Trustees can be held personally liable for their failure to do so.  29 U.S.C. §§ 1104, 1109, 1132(g)(2).  The Fund is administered in the District of Columbia.

4.     The Trustees adopted the CCU Collection Procedures governing the collection of employer contributions and reports.

5.     Under these Procedures, contributions and reports are due on or before the 15th day of the month ("Due Date") following the month in which work is performed.  Once contributions are delinquent, the Procedures authorize the assessment of interest at 15 percent per annum and an additional amount, the greater of 15 percent per annum or 20 percent of the delinquent contributions, in the form of an additional computation of interest or liquidated damages.

6.     I am personally familiar with the account of Accent Masonry LLC ("Accent Masonry" or "Defendant").

7.     Accent Masonry, acting through its authorized agent or officer, signed a collective bargaining agreement ("Agreement") with the International Union of Bricklayers and Allied Craftsmen Local Union Nos. 5 Oklahoma/Arkansas, now merged into Local 5 Oklahoma/Arkansas/Texas (hereinafter Local 5 OK/AR/TX), which obligated Accent Masonry to submit monthly reports and payments to the IPF, IHF, and IMI on behalf of its covered employees pursuant to the foregoing Procedures.

2318834.01

8.     Accent Masonry has performed work in the jurisdiction of 5 OK/AR/TX, which is covered by the Agreement.

9.     Defendant has failed to submit required reports and contributions for any work performed during the months of March 2006 through the present.  Accordingly, Plaintiffs sought to conduct an audit of Defendant's books and records in order to determine the total of moneys due the Fund for work performed pursuant to the Agreement.

10.    Under the terms of the Agreement, the terms of the Plan and Trust Agreement adopted by the IPF Board of Trustees, the CCU Procedures and Supreme Court precedent, Plaintiffs are entitled to conduct an audit of the books and records of Defendants in order to determine whether contributions have been made in compliance with Defendant's obligations

11.    Despite several requests by the IPF, or a representative of the IPF, for access to Defendant's books and records so that the IPF auditor could determine the total due the Fund for work performed covered by the Agreement, Defendant refused to grant the IPF auditor access to its books and records

12.    Accordingly Plaintiffs have been forced to estimate the amount of contributions due from Defendants for work performed during the months of March 2006 through August 2007.

13.    Plaintiffs calculated the average number of hours worked by Defendant per month, by adding up the total number of hours (1,320.50 hours) reported by Defendant during the number of months (10 months) prior to March 2006 for which hours were reported, thus determining that Defendant had worked an average of 132.05 hours per month through the last month (February 2006) for which Defendant submitted a report to Plaintiffs.

3

14. Plaintiffs then multiplied the average number of hours worked per month (132.05 hours) by the total number of months for which Defendant has failed to submit reports (18 months) and estimated that Defendant has failed to report a total of 2,376.90 hours worked pursuant to the Agreement. By applying the appropriate contribution rates to these estimated hours worked, Plaintiffs have estimated the total of unpaid contributions due by Defendant for work performed during the months of March 2006 through August 2007.

15. As provided for in ERISA Section 502(g)(2)(A), Defendant is estimated to owe the IPF, IHF and IMI contributions in the amount of $20,655.50 for work performed during the months of March 2006 through August 2007.

16. As provided for in ERISA Section 502(g)(2)(B) and the Collection Procedures, Defendant is obligated to pay the IPF, IHF and IMI interest in the amount of $2,209.33 on such estimated delinquent contributions, calculated from the Due Date, through September 17, 2007, at the rate of 15 percent per annum.

17. As additionally provided for in ERISA Section 502(g)(2)(C)(ii) and the Collection Procedures, Defendant is obligated to pay the IPF, IHF and IMI $3,807.18 in liquidated damages on such estimated delinquent contributions, at the rate of 20 percent.

18. As of the date of this Declaration, despite due demand thereof, Defendant has failed to pay the contributions owed to the IPF, IHF, and IMI for work performed pursuant to the Agreement during the months specified above.

19. Thus, as provided for in ERISA Section 502(g)(2)(A) and the Collection Procedures, Defendant owes $20,655.50 in estimated delinquent contributions to the IPF, IHF and IMI.

2318834.01

20.     As provided for in ERISA Section 502(g)(2)(B) and the Collection Procedures, Defendant is obligated to pay the IPF, IHF and IMI interest in the amount of $2,209.33 on such estimated delinquent contributions, calculated from the Due Date through September 17, 2007, at the rate of 15 percent per annum.

21.     As additionally provided for in ERISA Section 502(g)(2)(C)(ii) and the Collection Procedures, Defendant is obligated to pay the IPF, IHF and IMI $3,807.18 in liquidated damages at the rate of 20 percent, on such estimated delinquent contributions.

22.     The court fee of $350.00 for filing this action is recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures.

23.     The process server's cost of $259.70 for serving the summons and Complaint is recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures.

24.     Attorney's fees of $5,183.50, which are recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures, have been incurred by the Plaintiffs in their attempt to collect delinquent contributions, interest and liquidated damages due from Defendant.  An accounting of the attorney's fees incurred in this action is presented in the Declaration of counsel to the IPF, which accompanies this Motion for Default Judgment.

25.     The total amount owed the IPF, IHF, and IMI by Defendant in estimated delinquent contributions for the months of March 2006 through August 2007, as set forth above, interest on such delinquent contributions owed the IPF, IHF, and IMI (calculated at the rate of 15 percent per annum from the Due Date through September 17, 2007), liquidated damages (at the rate of 20 percent) on such delinquent contributions owed the IPF, IHF and IMI, Court filing fee, process server's fee and attorney's fees is $32,465.21.

2318834.01

26.    Accordingly, Defendant owes Plaintiffs a balance of $32,465.21 as outlined above.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _____October 31_____, 2007        _____

David F. Stupar
Executive Director

6

1

5/13/02

**GENERAL COLLECTION PROCEDURES OF
THE CENTRAL COLLECTION UNIT OF
THE BRICKLAYERS AND ALLIED CRAFTWORKERS**


These General Collection Procedures govern the collection of delinquencies by the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU") on behalf of the following participating entities: Bricklayers and Allied Craftworkers International Union ("BAC"); Bricklayers and Trowel Trades International Pension Fund ("IPF"); Bricklayers and Allied Craftworkers International Health Fund ("IHF"); International Masonry Institute ("IMI"); Bricklayers and Allied Craftworkers Political Action Committee ("BACPAC"); and Local Officers and Employees Pension Fund ("LOEPF") (collectively "CCU Entities"). IHF and BAC SAVE are covered by Special Collection Procedures. Such Special Collection Procedures shall control when in conflict with these General Procedures.

I.      REPORTS AND PAYMENTS TO CCU ENTITIES

      A.      Due Date

            1.      Contributions and reports to the CCU Entities are due on or before the 15th day of the month following the month for which the contributions are being paid ("Due Date"), unless the collective bargaining agreement imposes a different Due Date.

            2.      Reports of participating employers must be filed each month even if no contributions are due for that month. All participating employers, whether submitting contributions directly or through a local administrator or local union, must use the standard CCU report form.

            3.      Employer reports will be date-stamped on the day received in the CCU Office, or in the case of local administrators or local unions, on the day received by the local. The stamped date will be the controlling date with regard to these Collection Procedures.

            4.      If any controlling date under these Collection Procedures falls on a weekend or legal holiday, the applicable date will be the next working day.

5.  The IPF is authorized by other CCU Entities to act on their behalf in litigation. All references to "CCU Office" in these Collection Procedures may also refer to "IPF Office," as applicable.

B.  Notice Of Delinquency

1.  If the CCU Office has not received payment by the last day of the month of the Due Date, the CCU Office will send a Reminder Notice to the employer. If payment has not been received 30 days after the Reminder Notice, a Notice of Delinquency will be sent to the employer.

2.  The Notice of Delinquency will advise the employer that required contributions were not received by the Due Date and warn that if the contributions are not received within 15 days (60 days following the Due Date), the employer will be considered delinquent ("Delinquent Date") and will be assessed interest at 15% per annum (retroactive to the Due Date) and may be required to pay Liquidated Damages of 20% of the delinquent amount. The Notice of Delinquency will require the employer to notify the CCU Office within five (5) days of the date of notice if the employer believes that the Notice of Delinquency was sent in error.

C.  Notice Of Referral To Counsel

1.  If the CCU Office has not received payment within 15 days of the Notice of Delinquency, the CCU Office will send to the employer a Notice of Referral to Counsel.

2.  The Notice of Referral to Counsel will advise the employer that payments were not received by the Delinquent Date and that payments for contributions and interest are due and owing. Unless all sums owed are received by the CCU Office within 10 days following the Notice of Referral to Counsel, liquidated damages up to 20% of the delinquent contributions or statutory interest may be imposed and the matter automatically will be referred to counsel. The Notice of Referral to Counsel also will state that counsel will be instructed to seek all sums recoverable, including contributions, interest, liquidated damages or statutory interest, and all attorneys' fees.

2

II.     COUNSEL

    A.     Procedures

        1.     If CCU has not received the contributions and applicable interest within 10 days of the Notice of Referral to Counsel, the matter automatically will be referred to counsel no later than 15 days from the due date.

        2.     Within 10 days of referral, counsel will send a letter to the employer advising that if payment of contributions, interest and other damages is not received within 10 days, suit will be instituted.

        3.     Suit thereafter will be instituted.

    B.     CCU Policy Following Referral To Counsel

        1.     Following the referral of a matter to counsel, the CCU Office will have no authority to deal with an employer except to discuss computations.

        2.     Counsel shall file suit for all moneys recoverable, including damages that may be recoverable under Section 502(g)(2) of ERISA and also may seek remedies under applicable state law against individual corporate officers and/or shareholders.

        3.     The CCU is authorized to seek legal redress prior to the time that the above procedures are exhausted if, in his sole discretion, the Director concludes that the interests of affected participants require immediate action. If an employer fails to make payment when due, suit may be filed to collect all delinquent contributions, interest and other damages regardless of other exhaustion requirements in these Collection Procedures.

III.     AUDITS

Audits will be conducted to insure full compliance with employer obligations under collective bargaining agreements. Every employer can expect to be audited at some time. If a delinquency is discovered as the result of an audit, the employer will be assessed the cost of the audit.

3

A.    Detection Of Delinquent Employers Subject To Audit

    1.    At least once every year, the Executive Directors of the IPF and IHF will send information to participants reflecting contributions received from participating employers.  The participants will be encouraged to report missing hours to the CCU.

    2.    The CCU will take steps to insure that delinquencies of participating employers are recovered.

B.    Audits Performed By Third Parties

    1.    The CCU will rely upon audits performed by third parties when CCU determines that they conform to auditing procedures contained in the CCU's Guidelines.

    2.    The CCU periodically will monitor the audits of third parties in order to confirm their reliability.

C.    Audits Performed On Employers Contributing Directly To The CCU

    1.    The CCU will coordinate with third parties who perform audits on employers contributing directly to CCU and will insure that such audits conform to CCU guidelines.

    2.    As to employers contributing directly to the CCU who are not subject to audits by third parties, CCU will perform two types of payroll audits on directly contributing employers in order to insure compliance.

        a.    <u>Random Audits</u> -- Audits may be conducted on any participating employer at any time, on a random basis, at the direction of the Director.

        b.    <u>Problem Audits</u> -- When the Director receives information from a local union, covered member or other source indicating that an employer may be delinquent, the Director may order that an audit be conducted.

D.    Notification Of Audit Delinquency

    1.    The CCU Office will send a Notice of Delinquency to audited employers found to be delinquent stating the amount of additional contributions owing as a result of the audit.

    2.    Any unsatisfied audit deficiency will be treated according to the CCU's Collection Procedures following the intervention of counsel.

4

E.     Form of Audits

    1.     All audits will be carried out under procedures formulated by the Director.

    2.     All employer books and records set forth in the audit procedures will be made available to the CCU auditor.

IV.     BONDS

The Director may, in his sole discretion, require an employer to post a cash or surety bond in an amount and under terms necessary to protect the interests of the applicable CCU Entity.

5

2

## SPECIAL COLLECTION PROCEDURES FOR IHF

Due to substantial employer delinquencies which threaten the financial health of the Bricklayers & Allied Craftworkers International Health Fund ("IHF"), the following Collection Procedures shall apply to the IHF. Such Special Collection Procedures shall control when in conflict with the General Collection Procedures applicable to all CCU entities.

I.      IHF REPORTS AND PAYMENTS TO CCU

    A.      Due Date

        1.      Contributions and reports for IHF are due on or before the 15th day of the month following the month for which the contributions are being paid ("Due Date"), unless the collective bargaining agreement imposes a different Due Date.

        2.      Reports of participating employers must be filed each month even if no contributions are due for that month. All participating employers, whether submitting contributions directly or through a local administrator or local union, must use the standard CCU report form.

        3.      The date the Employer's check is deposited into the bank, or in the case of local administrators or local unions, on the day received by the local,. will be considered the controlling date in calculating time under these Collection Procedures.

        4.      If any controlling date under these Collection Procedures falls on a weekend or legal holiday, the applicable date will be the next working day.

        5.      The IPF is authorized by IHF to act on its behalf in litigation. All references to "CCU Office" in these Collection Procedures may also refer to "IPF Office," as applicable.

    B.      Notice Of Delinquency

        1.      If the CCU Office has not received payment from an IHF employer by the Due Date, a Notice of Delinquency will be sent to the employer.

        2.      The Notice of Delinquency will advise the employer that required contributions were not received by the Due Date and warn that if

the contributions are not received within 15 days of the Due Date, the employer will be considered delinquent ("Delinquent Date"). On the Delinquent Date a late fee assessment of 20% of delinquent contributions representing liquidated damages will be imposed and the CCU will have the right to assess interest at 15% per annum (retroactive to the Due Date).. The Notice of Delinquency will require the employer to notify the CCU Office within five (5) days of the date of notice if the employer believes that the Notice of Delinquency was sent in error.

C.    Notice Of Referral To Counsel

1.    If the CCU Office has not received payment within 15 days of the Due Date, the CCU Office will send to the employer a Notice of Referral to Counsel.

2.    The Notice of Referral to Counsel will advise the employer that payments were not received by the Delinquent Date and the matter automatically will be referred to counsel if payment is not received within 10 days. The Notice of Referral to Counsel also will state that counsel will be instructed to seek all sums recoverable, including contributions, interest, liquidated damages or statutory interest, and all attorneys' fees.

3.    On the date the Notice of Referral to Counsel is transmitted, the CCU Office will notify the applicable local union that the employer is delinquent. The CCU Office will seek the assistance of the local union in the collection of the delinquency , including the exercise by the local union of all rights under the collective bargaining agreement.

D.    Referral to Counsel

If the delinquent contributions, interest and liquidated damages are not paid within 10 days of the Notice of Referral to Counsel, the matter will be referred to counsel automatically.

II.    COUNSEL

A.    Procedures

1.    Within 5 days of referral, counsel will send a letter to the employer advising that if payment of contributions, interest and other damages is not received within 5 days, suit will be instituted.

2.    Suit thereafter will be instituted.

2

B.   CCU Policy Following Referral To Counsel

1.   Following the referral of a matter to counsel, the CCU Office will have no authority to deal with an employer except to discuss computations.

2.   Counsel shall file suit for all moneys recoverable, including damages that may be recoverable under Section 502(g)(2) of ERISA and also may seek remedies under applicable state law.

## III.   DELINQUENT EMPLOYERS

A.   Contributions Applied to Oldest Delinquency

1.   When an employer fails to remit reports and required contributions to the IHF when due according to the terms of these IHF Special Collection Procedures, 15 days after the contributions are due, the employer shall be considered a Delinquent Employer.

2.   These rules will reaffirm the practice that contributions of a Delinquent Employer will be applied to satisfy the oldest delinquency of that employer, subject to the discretion of the Director.

3.   In the event that the contributions of a Delinquent Employer are applied to that employer's oldest delinquency, those contributions will not result in hours toward eligibility for the Delinquent Employer's current employees.

B.   Suspension, Termination and Seeking Legal Redress

1.   The Director may, in his sole discretion, suspend or terminate a Delinquent Employer's participation in the IHF.  Such suspension or termination will result in the loss of benefits to the Delinquent Employer's employees and/or the return of contributions to the employer, subject to the discretion of the Director.

2.   The CCU is authorized to seek legal redress at any time prior to the time that the above procedures are exhausted if, in his sole discretion, the Director concludes that the interests of affected participants require immediate action.  If an employer fails to make payment when due, suit may be filed to collect all delinquent contributions, interest and other damages regardless of other exhaustion requirements in these Collection Procedures.

3.   Whenever those Special Collection Procedures are utilized for IHF delinquencies, the Director, in his sole discretion, may apply these procedures, including time requirements for delinquencies, to

3

delinquencies of other CCU entities that arise at or around the same time.

IV.     NOTIFICATION TO EMPLOYEES

A.     Notice of Delinquency

1.     At the time of referral of a delinquency to counsel pursuant to these procedures, the IHF shall notify the affected employees of the Delinquent Employer that they may lose coverage due to their employer's delinquency

2.     In the event that the Delinquent Employer is making contributions on behalf of its current employees, but those monies are being applied to the employer's past delinquencies, the current employees may be advised that contributions are not resulting in hours of eligibility due to the employer's delinquency.

B.     Notice of Loss of Coverage

1.     If an employee of a Delinquent Employer is about to lose benefits due to the employer's delinquency, the IHF shall provide fourteen (14) days notice to the employee of such impending loss of benefits, subject to the discretion of the Director.

V.     BONDS

A.     Every IHF employer is required to post a cash or surety bond in an amount necessary to protect the interests of the IHF.

B.     All bonds will be in a form and amount set in the sole discretion of the Director.

VI.     NON-JOB SITE CONTRIBUTIONS

A.     Non-Job Site Contributions

1.     As described more fully in the BAC IHF Summary Plan Description, "non-job site Employees" are eligible for coverage if they are employees of an employer that contributes to the IHF. "Non-job site employees" are employees who are not in a job category covered by their employer's Collective Bargaining Agreement. Coverage for non-job site employees is provided as a convenience to the employer.

2.     Contributions for covered non-job site employees are due in accordance with the BAC IHF Summary Plan Description and these special Collection Procedures. Contributions for covered non-job site employees must be sent to the CCU Office (not to the Fund office) with the current report form. If the CCU Office

4

receives payments for non-job site employees without the current report form, or if the payments are sent to the Fund office, those payments will be returned, possibly resulting in delay, suspension or termination of coverage.

B.   Non-Job Site Delinquency

1.   If an employer fails to make contributions when due for all its covered employees (both regular and non-job site employees), the IHF may, at its option, 1) reject any contributions tendered for non-job site employees, 2) treat the employer as delinquent as to all required contributions, and/or 3) suspend or terminate the employer's participation in the IHF.

2.   The termination of an employee's eligibility for coverage by the IHF resulting from the employer's delinquency does not constitute a Qualifying Event under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). The IHF is not required to and will not allow employees (whether regular or non-job site) whose coverage has terminated due to their employer's delinquency to continue coverage by paying their own premiums, as COBRA requires when a Qualifying Event occurs.

VII.   MISREPORTING HOURS

1.   If an employer misreports hours to the IHF, the employer shall be liable for all benefits paid based on those misreported hours, if a participant who otherwise would be ineligible for benefits is deemed eligible as a result of those misreported hours.

2.   If a participant misreports hours to the IHF, that participant shall be liable for all benefits paid by the IHF based on those misreported hours if that participant, who otherwise would be ineligible, is deemed eligible as a result of those misreported hours.

3.   If an IHF participant receives credit for misreported hours, those credits shall be disallowed, and the participant may be prohibited from further participation in the IHF.

4.   An employer that misreports hours for an employee, as set forth in paragraph 1 above, may be subject to suit instituted by CCU counsel, seeking the return of benefits payments and/or all other remedies permitted by law.

5.   An IHF participant who misreports hours, as set forth in paragraph 2 above, may be subject to suit instituted by CCU counsel, seeking the return of benefits payments and/or all other remedies permitted by law.

1876972.03

VIII.    SAMPLE IHF DELINQUENCY REFERRAL

| | |
|---|---|
| January 15 | Due date for work performed in December; Notice of Delinquency issued. |
| February 1 | Delinquent Date, Notice of Referral to Counsel and Notice to Local Union of delinquency: employer considered delinquent (20% late fee imposed.  Notice of Referral to counsel advises employer that it has 10 days to pay to avoid referral to counsel.) |
| February 11 | Case automatically referred to counsel.  Notice to Employees of delinquency. |
| February 16 | Demand letter from counsel requiring 5-day response. |
| February 21 | Suit filed. |

1876972.03

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN FLYNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0183 (RMC) |
| | ) | |
| ACCENT MASONRY LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF IRA R. MITZNER
## IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, IRA R. MITZNER, hereby declare as follows:

1.      I am a partner with the firm of Dickstein Shapiro LLP and the counsel of record for the Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, Charles Verlado, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero, and Ben Capp, Jr. ("IPF"), in the above-captioned case.  I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.      On February 18, 2007, a copy of the Summons and Complaint was served upon Tommie Garrett, as agent authorized to accept service on behalf of Accent Masonry, LLC.

3.      As of this date, no Answer to the Complaint is reflected on the docket.

2342756.01

4.    As set forth in the accompanying Declaration of David F. Stupar, Defendant owes the following sums to Plaintiffs:

| | | |
|---|---|---|
| $ | 20,655.50 | Estimated delinquent contributions due the IPF, IHF and IMI for work performed during the months of March 2006 through August 2007 |
| $ | 2,209.33 | Interest assessed on the above estimated delinquent contributions due the IPF, IHF and IMI, calculated at the rate of 15 percent per annum from the Due Date through September 17, 2007 |
| $ | 3,807.18 | Liquidated damages assessed on the above estimated delinquent contributions due the IPF, IHF and IMI, calculated at the rate of 20 percent |
| $ | 350.00 | Filing fee (for U.S. District Court) |
| $ | 259.70 | Process Server's costs |
| $ | 27,281.71 | Subtotal |

5.    Additionally, the Employee Retirement Income Security Act of 1974 ("ERISA") provides for the mandatory award of attorney's fees.  ERISA Section 502(g)(2)(D).  Plaintiffs' counsel has charged the Fund less than the firm's market rate in this matter for well-intentioned, public-spirited reasons.  Counsel for Plaintiffs has offered this reduced fee in order to mitigate financial hardships to the Fund, which provides retirement benefits to members of the International Union of Bricklayer and Allied Craftworkers.  We believe that our efforts help to ensure the viability of the Fund and, in turn, the welfare of those participants and beneficiaries who depend on their pensions for income after retirement.

6.    Counsel for the Funds, consistent with the decision of the United States Court of Appeals for the District of Columbia Circuit in *Board of Trustees of the Hotel and Restaurant Employees Local 25 and Employers' Health and Welfare Fund v. JPR, Inc.*, 136 F.3d 794, 800-808 (D.C. Cir. 1998), on remand, 1999 WL 1567733 (D.D.C Sept. 10, 1999), and

2

for the reasons set forth in paragraph 5 above, therefore seeks to recover counsel's market rates in this action rather than the reduced fee charged to the Fund.

7.    The fees incurred to date by Dickstein Shapiro LLP in this action have been calculated according to the normal billing rates in effect currently or at the time services were performed for the Fund, and are as follows:

|  | Hours | Per Hour | Total |
|---|---|---|---|
| Ira R. Mitzner (Partner) | 1.10 | $535.00 | $  588.50 |
| Joel Dillard (Summer Associate) | 17.00 | $155.00 | $2,635.00 |
| Claudette Elmes (Paralegal) | 9.80 | $200.00 | $1,960.00 |
| **Total** | **27.90** |  | **$5,183.50** |

8.    The default of Defendant for failure to answer was entered by the Clerk of this Court on August 6, 2007.

9.    The total known balance due Plaintiffs by Defendant as of this date is $32,465.21.

10.    We therefore pray for entry of entry of default judgment in favor of Plaintiffs in the amount $32,465.21.

I declare under penalty of perjury that the foregoing is true and correct.

Date:    Nov. 2 1    , 2007                    Ira R. Mitzner

3

2342756.01

**EXHIBIT C**

Default - Rule 55A (CO 40 Revised-DC 02/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al.

_____

Plaintiff(s)

v.                                                    Civil Action No.  07-183 (RMC)

ACCENT MASONRY LLC

_____

Defendant(s)

RE:  ACCENT MASONRY LLC

## DEFAULT

It appearing that the above-named defendant(s) failed to plead or otherwise defend this action though duly served  with summons and copy of the complaint     on      February 18, 2007     , and an affidavit on behalf of the plaintiff having been filed, it is this _6th_ day of ___August___ , _2007_ declared that  defendant(s) is/are in default.

NANCY MAYER-WHITTINGTON, Clerk

By: _____

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>ACCENT MASONRY LLC, )<br><br>Defendant. ) | Civil Action No. 07-0183 (RMC) |

## JUDGMENT

The Summons and Complaint in this action having been duly served on the above-named Defendant on February 18, 2007, and the time for said Defendant to appear and defend herein having expired, and Defendant not having filed an Answer, and the Clerk having entered default, and the Plaintiffs having filed a declaration of a total amount due of $32,465.21, and Plaintiffs having moved for entry of judgment by default in that amount, it is hereby

ORDERED, ADJUDGED, AND DECREED that the final judgment in favor of Plaintiffs and against Defendant is hereby granted and ordered entered as the judgment in this action as follows:

1.     That Plaintiffs John Flynn, James Boland, Gerry O'Malley, Ken Lambert, Gerard Scarano. H. J. Bramlett, Eugene George, Paul Songer, Charles Velardo, Matthew Aquiline, Gregory Hess, Michael Schmerbeck, Vincent Delazzero, and Ben Capp, Jr., all of whom are Trustees of, and sue on behalf of, the Bricklayers & Trowel Trades International Pension Fund ("IPF"), 620 F Street N.W., 7th Floor, Washington, DC 20004, recover from

Defendant, Accent Masonry LLC, 3700 Phillips Boulevard, Moore OK 73160, the amount due of $32,465.21;

     2.     That Accent Masonry LLC be directed to submit all monthly reports and contributions that may come due the Plaintiffs subsequent to the filing of this judgment;

     3.     That Accent Masonry LLC, comply with its obligations to make timely and full contributions to the IPF; and

     4.     That said judgment is without prejudice to the right of Plaintiffs to seek recovery of any past or future delinquencies, interest, damages and reasonable attorney's fees and costs that may be owing to the Plaintiffs from Accent Masonry LLC.

     ORDERED, ADJUDGED AND DECREED that Plaintiffs have execution therefor.

Dated: _____, 2007       _____

                                            Rosemary M. Collyer
                                          United States District Judge

2342777.01

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al.,                    )
                                       )
                                       )
                    Plaintiffs,        )
                                       )
           v.                          )     Civil Action No. 07-0183 (RMC)
                                       )
ACCENT MASONRY LLC,                    )
                                       )
                    Defendant.         )
                                       )

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with

orders, judgments and stipulations:

Ira R. Mitzner, Esq.
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC  20006-5403
Telephone: (202) 340-2200
Facsimile    (202) 420-2201

Accent Masonry LLC
3700 Phillips Boulevard
Moore, OK  73160

2342785.01

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, JAMES BOLAND, GERALD )
O'MALLEY, KEN LAMBERT, GERARD SCARANO, )
H. J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, )
CHARLES VELARDO, MATTHEW AQUILINE, )
GREGORY R. HESS, MICHAEL SCHMERBECK, )
VINCENT DELAZZERO, and BEN CAPP, JR., )
as Trustees of, and on behalf of, the )
BRICKLAYERS & TROWEL TRADES )
INTERNATIONAL PENSION FUND, )
   620 F Street, N.W. )
   Washington, DC 20004 )
   (202) 783-3788, )
)
BRICKLAYERS AND ALLIED CRAFTWORKERS )
INTERNATIONAL HEALTH FUND \
   620 F Street, N.W.
   Washington, DC 20004     CASE NUMBER 1:07CV00183
   (202) 783-3788,
                         JUDGE: Rosemary M. Collyer

INTERNATIONAL MASONRY INSTITUTE   DECK TYPE: Labor/ERISA (non-employme
   620 F Street, N.W.
   Washington, DC 20004     DATE STAMP: 01/25/2007
   (202) 783-3788, )
)
    and )
)
INTERNATIONAL UNION OF BRICKLAYERS AND )
ALLIED CRAFTWORKERS )
   620 F Street, N.W. )
   Washington, DC 20004 )
   (202) 783-3788, )
)
               Plaintiffs, )
)
             v. )  Civil Action No.
)
ACCENT MASONRY LLC )
3700 Phillips Boulevard )
Moore, OK 73160, )
)
           Defendant. )
)

**COMPLAINT**

2200228.01

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the Defendant, allege as follows:

## CAUSE OF ACTION
### Jurisdiction and Venue

1.  This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund"), to enforce the terms of the Plan and Trust Agreements adopted by the IPF and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Labor Management Relations Act ("LMRA"). This action arises under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145, and Section 301 of the LMRA, 29 U.S.C. § 185. Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court as to the claims brought on behalf of the IPF, the Bricklayers & Allied Craftworkers International Health Fund ("IHF"), and the International Masonry Institute ("IMI"). As to the claims brought on behalf of the International Union of Bricklayers and Allied Craftworkers ("BAC"), jurisdiction is conferred under Section 301(c) of the LMRA, 29 U.S.C. § 185(c).

2.  The IPF, IHF, and IMI are administered in the District of Columbia. Venue for the claims asserted by the IPF, IHF, and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2)  Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

2200228.01

BAC maintains its principle office in the District of Columbia. Venue for the claims asserted by the BAC is therefore conferred on this Court pursuant to Section 301(c)(1) of the LMRA, 29 U.S.C. § 185(c)(1).

**Parties**

3.    Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, Charles Velardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Ben Capp, Jr., are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). Plaintiffs bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.    The IPF is also authorized to effect collections on behalf of the IHF, IMI and BAC, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

5.    Plaintiff, IHF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

6.    Plaintiff, IMI, is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

7.    Plaintiff, BAC, an unincorporated association, is a labor organization within the meaning of 29 U.S.C. § 152(5) and is entitled to bring suit under 29 U.S.C. § 185.

8.    Defendant, Accent Masonry LLC is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Oklahoma.

2200228.01

9.    Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

<u>**Violation Charged**</u>

10.    Accent Masonry LLC acting through its authorized agent or officer, executed a collective bargaining agreement with the Union.  That collective bargaining agreement is annexed hereto as Exhibit A and is hereinafter referred to as the "Agreement".

11.    Pursuant to the Agreement, Defendant agreed to make certain payments to the IPF, IHF, IMI, and BAC on behalf of covered employees of Defendant.

12.    Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

13.    Upon information and belief, Defendants have failed to properly submit required reports and contributions for hours worked pursuant to the Agreement.

14.    Plaintiffs seek to conduct an audit of Defendant's books and records in order to determine any amounts which may be owed for work covered by the Agreement.

15.    Under the terms of the Plan and Trust Agreement adopted by the IPF Board of Trustees, the CCU Procedures and Supreme Court precedent, Plaintiffs are entitled to conduct an audit of the books and records of Defendant to determine whether contributions have been made in compliance with Defendant's obligations.

16.    Under the terms of the Plan and Trust Agreement adopted by the IPF Board of Trustees, Plaintiffs are entitled to recover any delinquent contributions found due by the audit, as well as interest, calculated at 15 per cent per annum, and the greater of either an additional computation of interest calculated at 15 per cent per annum or liquidated damages at 20 percent, on the aforementioned delinquent contributions.

2200228.01

17.     Despite several requests by the IPF, or a representative of the IPF, for access to Defendant's books and records so that the IPF auditor can determine whether contributions have been made in compliance with Defendant's obligations, Defendant has failed to grant the IPF auditor such access to their books and records.

18.     Accordingly, Plaintiffs have been forced to estimate the amounts due the IPF, IHF, IMI and BAC by Defendant.

19.     The total of estimated contributions due the IPF, IHF, and IMI by Defendant for work performed during the months of March 2006 through December 2006 amounts to $66,817.35.

20.     Under the terms of the Plan and Trust Agreements adopted by the IPF, IHF, and IMI, interest in the amount of $3,860.39 calculated from the Due Date at the rate of 15 percent per annum and liquidated damages in the amount of $10,825.58 at 20 percent as provided for by ERISA, have been assessed on the estimated delinquent contributions payable to the IPF, IHF, and IMI for work performed by Defendant's employees during the time period March 2006 through December 2006.

21.     Defendant is also estimated to owe the BAC dues checkoff moneys in the amount of $392.24, and interest in the amount of $22.45, for work performed by Defendant's employees during the time period March 2006 through December 2006.

22.     To date the delinquent contributions, interest and statutory damages believed due and owing have not been paid.

23.     Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs

5

have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions in accordance with the terms and conditions of the Agreement.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.  For an order directing Defendant Accent Masonry LLC to turn over to Plaintiffs' auditor its books and records for the time period April 2005 through the present including, but not limited to, payroll records and the general ledger(s).  Plaintiffs will suffer irreparable injury in the absence of such injunctive relief and there is no adequate remedy at law.

Plaintiffs seek an order granting it:

    a.  Preliminary injunctive relief and

    b.  Permanent injunctive relief.

2.  For any additional amounts determined owed the IPF, IHF, IMI and BAC by Defendant, which are not yet ascertainable until an audit is conducted.

3.  For the total amount of $82,268.01, which is constituted as follows:

    a.  for estimated delinquent contributions in the amount of $66,817.35 due in connection with work performed by Defendant's employees during the months of March 2006 through December 2006 (ERISA Section 502(g)(2)(A));

    b.  for interest in the amount of $3,860.39 on such estimated delinquent contributions calculated at the rate of 15 percent per annum from the Due Date.  (ERISA Section 502(g)(2)(B));

    c.  for liquidated damages in the amount of $10,825.58 at the rate of 20 percent assessed on such estimated delinquent contributions. (ERISA Section 502(g)(2)(C));

2200228.01

d.  for estimated dues checkoff in the amount of $392.24 due in connection with work performed by Defendant's employees during the months of March 2006 through December 2006, and interest in the amount of $22.45 on such estimated delinquent dues checkoff. (CCU Procedures);

e.  for the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D)).

4.  In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

5.  That Defendant be directed to comply with its obligations to correctly report and to contribute to the IPF, IHF, IMI, and BAC all additional reports and contributions due and owing, and to pay the costs and disbursements of this action.

6.  Such other relief as this Court deems appropriate, including judgment for any contributions and/or interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: January 25, 2007

By: _____
Ira R. Mitzner, DC Bar No. 184564
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200

Attorneys for Plaintiffs

7

2200228.01

EXHIBIT A

OK0307D

# BRICKLAYERS AND ALLIED CRAFTWORKERS
## LOCAL #5 OF OKLAHOMA/ARKANSAS

This agreement is entered into this _____ 1st___ day of ____June _____, 2003___, by and between _____ (hereinafter referred to as the Employer), and the International Union Of Bricklayers and Allied Craftworkers Local No. 5 OK/AR_____, of (hereinafter referred to as the Union).

## ARTICLE I
## DURATION - TERMINATION - AMENDMENT

This agreement shall be effective commencing _____June 1, 2003__, and shall continue in full force to and including _____May 31, 2006__, and shall be automatically continued yearly thereafter unless written notice of decision to negotiate a new Agreement. In whole or in part, is given in writing by either party to the other not later than sixty (60) days no more than one hundred eighty (180) days prior to the expiration date or any anniversary date thereafter. It is also recommended by both parties to schedule labor management meetings one year prior to the expiration date of this Agreement. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

## ARTICLE II
## SCOPE OF WORK

A.     This Agreement shall cover new construction, maintenance, repair and renovation with all counties or portions thereof in the state of Oklahoma.

B.     This Agreement shall cover all Brick Masonry, Stone Masonry, Artificial Masonry work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that is determined by these parties to fall within the work jurisdiction of this Agreement.

In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

-1-

RECEIVED
MAY 1 2 2003
COLLECTIVE BARGAINING SERVICES



C.    All cork, Styrofoam, foam glass, fiberglass, or any other substitute when applied with mortar, cement, mastic of any type pitch, tar or any material used to stick the insulation is to be the work of members of Bricklayers and Allied Crafts. All marble and marble masons shall be covered in this Agreement. All split brick 1 1/4" and over in thickness shall be bricklayers' work.

## ARTICLE III
## MOST FAVORED NATIONS CLAUSE

A.    The union agrees that if it should enter into an agreement which provides for terms or conditions of employment which are more favorable than those contained in this Agreement for specific projects, particular segments of the masonry market or certain geographic areas, those same terms and conditions of employment will be made available to the Employer on the specified projects, particular segments of the masonry market or in those geographic areas covered. The only exception to this provision is those initial Agreements that are signed with newly organized employers to provide a bridge between those rates which are initially established and those which prevail for signatory contractors in the masonry market in which the newly organized contractor is going to operate.

B.    In the event that any question arises as to the meaning and application of this provision, either party may file with the other a written complaint. Such complaint will be initiated at Paragraph C of the grievance procedure set forth in Article XIX. of this Agreement (referred to Joint Arbitration Board), and shall be processed in accordance with the procedure for the handling of grievances and the final and binding arbitration of disputes.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A.    Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the Employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents a majority of the bargaining unit Employees, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future jobsites within the jurisdiction of the Union.

B.    No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their Employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. failure of any employee to comply with provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to

-2-

OK 0307

termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) If he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) If he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C.    International Union Representatives and the President/Financial Secretary and Field Representatives of the Union shall have access to the Employer's job sites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

## ARTICLE V
### HIRING PREFERENCE

Subject to the policies regarding traveling members established from time to time by the International Union of Bricklayers and Allied Craftworkers, the Employer, when engaged in any construction work within the geographic area covered by this Agreement, shall, in hiring employees covered by this Agreement, give preference to persons residing or normally employed in the geographic area covered by this Agreement.

## ARTICLE VI
### STEWARDS

The Employer shall work a steward appointed by the President/Financial Secretary or Field Representative of the Union on all jobs or the steward may be elected by the members of this Union who is working on said job. The steward shall be a working employee and shall when appropriate be granted reasonable time to conduct Union business.

## ARTICLE VII
### APPRENTICES

In order to train sufficient skilled mechanics for the industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. It is agreed that the Employer shall abide by the National apprenticeship Standards developed for masonry craft training and the State of Oklahoma/Arkansas Trowel Trades Apprenticeship standards.

**OK  0307**

## ARTICLE VIII
## TRAVELING CONTRACTORS

A.    When the Employer has any work specified in Article II. of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an Agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of this Agreement in effect in the jobsite area except as specified in paragraph D below. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article IX. of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite Local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article II. of this Agreement, the full terms and conditions of this Agreement shall apply.

2.    When the Employer has any work covered by this Article, the Employer shall
notify BAC Local 5 Oklahoma/Arkansas and the Local Union having jobsite jurisdiction within forty-eight (48) hours of being awarded a contract for a project. Further the Employer shall contact the jobsite Local Union and schedule a pre-job meeting, or, if appropriate, a telephone conference to be held at least twenty days (20) prior to commencing work to discuss labor requirements for the project.

3.    If the Employer has difficulty contacting the jobsite Local Union, or, if the jobsite Local Union is unable to refer the skilled employees required for the project. The Employer shall send a FAX outlining the labor required for the project to the office of BAC Local 5 Oklahoma/Arkansas at least twenty days (20) prior to beginning any work on the project.

4.    The parties agree that if the jobsite Local Union, or BAC 5 Oklahoma/Arkansas are unable within seventy-two (72) hours of a request, excluding weekends and holidays, to refer the skilled employees required for the project, this Article is not applicable to that project. The only exceptions are employees sent by the Union from any jurisdiction, then full terms and conditions apply to said Employee's only.

**OK  0307**

-4-



☞ OK 0307
5-13-03
(cdm)

## ARTICLE IX
### BRICKLAYER WAGES/BENEFITS (OKLAHOMA STATEWIDE)
Journeyperson/Apprentices

| Effective Date | June 1, 2003 | June 1, 2004 | June 1, 2005 |
|---|---|---|---|
| Base Wage | 20.16 | 20.41 | 20.66 |
| Health & Welfare | 4.20 | 4.20 | 4.20 |
| Pension | 1.50 | 1.50 | 1.50 |
| Annuity | .75 | 1.45 | 2.30 |
| IMI | .34 | .39 | .44 |
| Apprentice | .05 | .05 | .05 |
| TOTAL PACKAGE | 27.00 | 28.00 | 29.15 |

AØ

**Schedule of Base Rates for Apprentices are calculated at percentages of a Journeypersons Base Rate

1ST 6 months-------------50%       2nd 6 months------------------------60%

3rd 6 months-------------70%       4th 6 months------------------------80%

5th 6 months-------------90%       6th 6 months------------------------95%


### TAXABLE DEDUCTIONS
Journeyperson/Apprentices

*I.U. Dues checkoff is equivalent to 1% of Total Pkg.   *Local Dues Checkoff i equivalent to 1.5% of Total Pkg.

Taxable Deductions to be deducted from the Base Wage by the Employer for eac Hour or portion thereof for which a covered Employee receives pay are a follows:

EFFECTIVE JUNE 1, 2003              EFFECTIVE JUNE 1, 2004              EFFECTIVE JU 1, 2005

Vacation Fund___1.00___Per Hour    Vacation Fund_1.00__Per Hour    VacationFund__1.00__Per Hour
I.U. Dues Checkoff_27_Per Hour     I.U. Dues Checkoff_28_Per Hour  I.U. Dues Checkoff_29_Per Hour

-5-



Local Dues Checkoff .41  Per Hour        Local Dues Checkoff .42 Per Hour        Local Dues Checkoff .44 Per Hour

**A.**    This agreement encompasses all of the Counties in Oklahoma. The hourly wage rates for all employees performing work covered under this Agreement are specified in Article IX page five (5).

**B.**    The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning (first anniversary) and (second anniversary) among the various benefit funds specified in Article X.

**C.**    The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law, and transmit monthly to the Union (or to any agency designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to checkoff. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid.

## ARTICLE X
## JOINTLY TRUSTEED FUNDS

**Section L.**    In addition to the wages and other payments herein provided for, the Employer agrees to pay the specified contributions to the following designated funds.

    **A.**    <u>Bricklayers and Trowel Trades International Pension Fund.</u>

    1.    The contribution to the Bricklayers and Trowel Trades International Pension fund (IPF) shall be a total of ( $1.50 ) for each hour or portion thereof, for which a covered employee receives pay.

    2.    The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

    **B.**    <u>Bricklayers and Allied Craftworkers International Health Fund</u>

    1.    The contribution to the Bricklayers and Allied Craftworkers International Union Local 5 of Oklahoma/Arkansas Health and Welfare Plan (or successor Health & Welfare Plan designated by the Union) shall be a total of (refer to Article IX Wages/Benefits) for each hour or portion thereof, for which a covered employee receives pay.

    2.    The payments required above shall be made to the Bricklayers and Allied Craftworkers International Union Local 5 of Oklahoma/Arkansas Health and Welfare Plan, which was established under and Agreement and Declaration of

-6-

OK  0307

12-13-06    12:25    From-IUBAC    2023930219    T-845    P.010/025    F-607

Trust, dated August 5, 1971, (or successor Health and Welfare Plan designated by the Union).

## Vacation Fund

**C.**    **Bricklayers Int'l Union No. 5 of Oklahoma /Arkansas Vacation Trust Fund**

1.    The contribution to the Bricklayers International Union No. 5 of Oklahoma/Arkansas Vacation Trust Fund shall be a total of (Refer to Article IX Wages/Benefits) for each hour or portion thereof, for which a covered employee receives pay.

2.    The Employer agrees that this Vacation Fund contribution shall be deducted from the covered employees' wages after all tax deductions have been made.

3.    The payments required above shall be made to the Bricklayers International Union No. 5 of Oklahoma/Arkansas Vacation Trust Fund, which was established under and Agreement and Declaration of Trust, dated July 18, 1985.

NOTE: The above referenced Local Trust documents as currently written specify composition of committees and full fiducial responsibility of trustees to each Local Trust fund with the exception of the name change of all the aforementioned local Trust funds which shall be "Bricklayers International Union No. 5 of Oklahoma/Arkansas" shall remain in tact and unaltered unless done by Trustees to said funds.

**D.**    **Annuity**

The Employer hereby agrees to participate in BAC SAVE - The Bricklayers and Trowel Trades International Retirement Savings Plan (the Plan) on behalf of all employees represented for purposes of collective bargaining under this Agreement and other employees as permitted under the Plan. The contribution to the Bricklayers and Trowel Trades International Retirement Savings Plan(Annuity) shall be a total of (Refer to Article IX Wages/Benefits) for each hour or portion thereof, for which a covered Employee receives pay. The Employer will forward the hourly contributions to International Trowel Trades Fringe Benefit Funds or its successor at such time, and in such form and manner as required pursuant to the Plan and Declaration of Trust and the requirements of law.

**E.**    **International Masonry Institute**

1.    The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating

-7-                                    **OK 0307**

activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2.  In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions equal to three (3) percent of total hourly wage and benefits package; however, this figure is a goal that can only be reached in stages over a period of time.

3.  As contributions from this geographical area increase, IMI will be able to devote a portion of those monies to advertising and promotion, research and development, apprenticeship and training and labor/management relations programs directed specifically to this area.

4.  In this Agreement, the parties intend to take a first step toward the overall objective by establishing a realistic level of support for IMI. With these principles in mind, the parties agree as follows:

(A)  Effective June 1, 2003 the contribution to the International Masonry Institute shall be a total of (Refer to Article IX Wages/Benefits) for each hour, or portion thereof, for which a covered employee receives pay.

(B)  Effective June 1, 2004 the contribution to the International Masonry Institute shall be a total of (Refer to Article IX Wages/Benefits) for each hour, or portion thereof, for which a covered employee receives pay.

(C)  Effective June 1, 2005 the contribution to the International Masonry Institute shall be a total of (Refer to Article IX Wages/Benefits) for each hour, or portion thereof, for which a covered employee receives pay.

**Section 2.**     The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trusts, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trusts.

**Section 3.**     The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 4.**     For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

**Section 5.**     Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen and apprentices.

**Section 6.**     All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the

-8-

**OK 0307**

12-13-06    12:26    From-IUBAC    2023930219    T-645  P.012/025  F-607

accuracy of contributions to the funds designated in Section of this Article. Any employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audits.

Section 7.    Contributions due under this Article are due on the 15th day of the month following the month in which the work was performed. Any contribution and/or reports not received by the 15th day of the month following the month in which the work was performed, shall be deemed delinquent. Fifteen (15) days after the date payments become delinquent, the Union shall have the right to take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, and any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of payments due together with attorneys' fees and such liquidated damages as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

The Union or the Trustees shall have the right to demand payment of contributions specified in this Article from the bond posted by the Employer pursuant to this Article thirty (30) days after said contributions are delinquent. By demanding payment from said bond, the Union and the Trust Funds do not waive any other rights at law for collection of delinquent contribution including but not limited to the right to file a material men and mechanics liens for the payment of such delinquent contributions.

Section 8.    The Employer and the Union shall both use their best efforts to accommodate covered Employees working outside the jurisdiction of the Employees Local Union who wish any fringe benefits paid to be reciprocated to the Employee's designated Home Fund.

F.    **Oklahoma/Arkansas State Trowel Trades Joint Apprenticeship Fund**

1.    The contribution to the Oklahoma/Arkansas State Trowel Trades Joint Apprenticeship Fund shall be a total of (Refer to Article IX. Wages/Benefits) for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the Oklahoma/Arkansas State Trowel Trades Joint Apprenticeship Fund, which will be established under an Agreement and Declaration of Trust, dated June 1, 1994.

G.    **Bonding**

Employers party to this Agreement shall furnish, for the term of this Agreement, an approved irrevocable letter of credit from a FDIC bank or a performance and payment bond in approved form and either shall be in the sum of $20,000.00, payable to the International Pension Fund. The bond (or alternatively an irrevocable letter of credit) shall be furnished within five (5) working days upon becoming signatory to this Collective Bargaining Agreement with a duly qualified bonding company to secure payment of all fringe benefits due and owing under the provisions of this Agreement. Any bond shall also provide that the bonding company shall serve thirty (30) days written notice before cancellation of said bond to the International Pension Fund. The bond (or alternatively an irrevocable letter of credit) will be held in the International Pension Fund Administrative Fund Office.

-9-

● ●

## ARTICLE XI
## HOURS OF WORK, PAY PERIOD, OVERTIME, SHIFTS, AND HOLIDAYS

**Section 1.**    The standard work day shall consist of eight (8) hours of work between the hours of 8:00 a.m. and 4:30 p.m., with a 30 minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

**Section 2.**    All employees working under this Agreement shall be paid in cash or by check weekly before quitting time within five working days after the closing of the pay for the pay week. An employee being laid off shall be given his final paycheck in full for all hours of employment at the end of his/her work shift.

**Section 3.**    All time worked before and after the established eight (8) hour work day, Monday through Friday, and all time worked on Saturdays, shall be paid for at the rate of 1 ½ times the hourly base wage rate in effect. All time worked on Sundays and on the holidays specified in Section 5 of this Article shall be paid for at the rate of double the hourly base wage rate in effect.

**Section 4.**    The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule. The schedule of approved shifts which can be adopted by mutual consent of the Employer and the President/Financial Secretary of the jobsite Local Union as Section 8 of Article XI.

**Section 5.**    Holiday work performed on Sunday and the following holidays; **Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas, and New Years Day** shall be paid at the rate of **Double Time**. If the holiday falls on Saturday, then the Previous Friday and the holiday will be observed as the holiday, and if the holiday falls on Sunday, then the following Monday and the holiday will be observed as the holiday. At no time can holidays be made up as straight time or the rate of 1 ½ times the hourly base wage rate in effect.

**Section 6.**    **Make-Up Days**:  In the event employees working under this Agreement lost six (6) or more hours of work during the work week due to inclement weather, the Employer may, at his option, schedule a make-up day on Saturday (or Friday if the project is scheduled on a four (4) ten (10) hour day work week). The make-up work day shall be considered identical in start and stop times as the regular work day. It is agreed that any make-up day work will be made available to the job site employees first. Employer will not discharge or discriminate against any regular employee who declines to work on a make-up day, as it shall be voluntary to all Employees. In no event shall the Employer attempt to circumvent the overtime provisions of this Agreement by employing supplemental labor for Saturday work.

**Section 7.**    The Employer may elect to schedule work on four (4) ten (10) hour work days per work week. Changes in the work hours, other than those provided above, in special cases, may be made to meet special conditions upon application to the Local Union President/Financial Secretary.

-10-

OK 0307

12-13-06    12:26    From-IUBAC                                2023930219        T-845  P 014/025  F-607

**Section 8.**    **Shift Work:**  Where there are relay gangs of two or three shifts in twenty-four (24) successive hours, straight time shall be applicable, excepting Saturday, which shall be covered By Section 3 (overtime work) (Saturday) and all Sundays and holidays shall be paid at the rate of DOUBLE TIME. When two (2) shifts are engaged, the first shall work eight hours for eight hours pay (regular), and the second shall work seven hours for eight hours pay. When three shifts are engaged, the first shift shall work eight hours at regular pay, and the 2nd and 3rd shifts shall draw eight hours pay for seven hours work. No member will be allowed to work over eight hours in a twenty-four hour period unless he draws overtime after the first 8 hours work, as detailed in Section 3.

**ARTICLE XII**
**PAY DAY**

**A.**    Employees shall not be made to suffer the loss of time occasioned by the erection or stocking of scaffolds or by moving from one job to another job, during work hours.

**B.**    Employees shall be paid before quitting time on Friday of each week and should an employee not receive their pay on the designated pay day, at the specified time, no further work will be permitted, until all members are paid. Also, after regular work hours, overtime will be paid while waiting for pay on the job.

**C.**    Pay day will be each week, with no more than five (5) working days hold back.

**D.**    It is further agreed that all employees covered by this Agreement, shall be furnished on pay day, a check stub, pay envelope or receipt listing the date, Employer's Name, deductions for social security, withheld taxes, and number of hours represented by the check, also gross and net amount due, plus any other deductions from wages, required by law.

**E.**    When an Employee is discharged, he shall be paid at once.

**F.**    The Foreman shall notify the men by 10:00 a.m. as to whether or not they are going to work, when weather conditions are questionable. The employees will furnish the Superintendent or Foreman their phone number, so that the Foreman is able to inform them of the starting time.

**ARTICLE XIII**
**WORKING CONDITIONS**

**1.**    Employees will not be required to build walls over four 4'8" in height except where there is overhead obstructions.

**2.**    Employees will not be required to reach over thirty-two (32) inches above their feet for mortar and not over sixty (60) inches in height for other materials.  A ladder shall be provided by the Employer for the convenience of employees to reach the place they are working whether above or below ground.  A ladder will be provided for every one hundred (100) feet of horizontal scaffold and shall extend at least three (3) feet above floor or scaffold.  It shall be securely tied to scaffold and remain in place as long as a member is working thereon.

-11-

**OK  0307**



3. Employees will not be required to reach down a distance more than approximately twelve (12) inches to veneer steel or concrete beams.

4. No scaffold board shall be used under the size of 2 x 10 inches. Three (3) 2 x 10 and 3/4 inch plywood or three (3) 4 x 4 and 3/4 inch plywood is permissible.

5. Mortar boards shall be blocked or set on stands at least sixteen (16) inches above scaffold floor.

6. SAWS: All masonry saws shall have belt and blade guards, and wet and dry saws shall be grounded in accordance with Safety requirements. On all wet saws the Employer shall furnish elbow length gloves and aprons.

7. Employees will be given a ten (10) minute break at mid-morning and another ten (10) minute break at mid-afternoon. The steward will help the Foreman to see that this section is strictly adhered to. The break shall be taken at or near the work place with refreshments being brought to the work site by the employee at the beginning of the work day. No one shall leave the work site during their break. In the event that breaks are being abused, the steward or Foreman shall notify the Local office to discontinue breaks on that one particular project.

8. Where dry saws are operated inside or outside a building in a manner that the dust from it would be injurious to the health of the operator or other employees, a blower fan or dust collector or filtered dust mask shall be provided by the Employer.

9. The laying of blocks or units weighing over forty (40) pounds may be laid by employees working pairs.

10. A sanitary and suitable toilet shall be provided at all jobs by the Employer. On jobs where the plumbing is tied onto the city sewage, a commode with running water shall be provided or portable toilet.

11. Good, clean drinking water shall be provided at all times and served from a closed container. Ice shall be put into the water during warm weather. Sanitary drinking cups shall be furnished at all times.

12. There shall be no prescribed rule or order or limitation by either Bricklayer or Employer as to the amount or number of bricks, tile, block or any masonry material to be laid in any given time.

13. No employee shall put mortar on masonry wall except a member of this Union.

14. Straight walls shall be laid to a line, and on jobs where specifications require slushing the line is not considered laid out until slushing is finished.

15. When job conditions merit a tool shed, it shall be provided.

**OK  0307**

-12-

16.  Any employer employing more than three (3) mason and doing work in this jurisdiction shall employ at least fifty (50) per cent members of this Local Union if local members are available.

17.  In case of fire or theft on a job at any time the Employer shall not be responsible for the loss of mechanics tools and clothing lost by such fire or theft.

18.  The men setting the twig must set twig while other bricklayers are striking and/or walling masonry.

19.  The wages, hours and conditions of employment contained in the collective bargaining contracts of the Local Union, shall constitute its working rules and regulations.

20.  Members will be provided with a face mask by the Employer when pouring insulation such as peralite, zonalite, etc.

21.  Proper lighting will be provided, for members to see to do their work properly, at all times by the Employer.

22.  Each member must report all violations of the working rules and regulations, of which he is aware to the steward on the job or to the Business Agent or to the Local's Business office.

### ARTICLE XIV
### SCAFFOLDING AND MECHANICAL DEVICES

1.  All swinging scaffolds used for the laying of masonry shall have at least one half (½) inch cables, shall be at least four (4) feet wide and have proper guard rails. When overhead protection is required for safety, it shall be eight (8) feet maximum height above the scaffold platform, with not less than two (2) inch planking and shall not be under four (4) feet wide. The overhead protection shall be a part of the swinging scaffold. Any work being performed above the outrigging of the scaffold shall require additional protection by planking the outrigging, as far out as is possible.

2.  Corner poles may be used on masonry over studs or veneering of existing materials. When irregular materials are used that might warrant the use of corner poles, permission must be granted by the Local Union.

3.  No scaffold deck shall be farther away from the wall than approximately four (4) inches. Where projections or pilasters occur which would cause the scaffold to exceed four inches, the scaffold must be built around the obstructions.

4.  In the use of scaffold, the manufacturers recommendations and safety requirements shall be followed. All of the above must meet OSHA regulations and OSHA regulations will govern.

### ARTICLE XV                    ⁻OK  0307

-13-

### THE DUTIES OF THE STEWARD ON THE JOB SITE

1. To inspect dues books, receipts for initiation fees and travel service dues.

2. To report violations of the working rules, Collective Bargaining Agreement, unsafe job conditions and other job site disputes to the Foreman or Superintendent, President/Financial Secretary if the condition or violation is not corrected or if the dispute is not promptly resolved.

3. To assist any injured member in receiving proper and immediate care.

4. To report to the President/Financial Secretary or Field Representatives any work assignments falling within the jurisdiction of this Local Union made to employees represented by another trade Union or Labor organization.

5. If the Steward is unable to promptly resolve a problem at the job site, he shall contact the President/Financial Secretary as soon as possible. He shall not have the authority to order a work stoppage or interruption in the work progress.

6. Any member who wishes the Union to process a grievance from him against an Employer, must present his grievance in writing to the President/Financial Secretary of the Local Union within seventy-two (72) hours of the time of the event about which he is complaining or as provided in the Local Union's Collective Bargaining Agreement.

7. In no case shall a Steward be discharged, laid off or fired because of the manner of performance of his duties as a Steward.

8. Stewards shall not be transferred from one job to another unless the President/Financial Secretary agrees to the transfer.

### ARTICLE XVI
### RESPONSIBILITY OF MEMBERSHIP

All members of other Local Unions affiliated with the Bricklayers and Allied Craftworkers International Union who are working within the jurisdiction of this Local Union must notify this Union of jobs on which they are employed.

### ARTICLE XVII
### REGULATING OF APPRENTICES

A. Apprentices shall be governed by the apprentice standards as approved by the Oklahoma/Arkansas State Trowel Trades Joint Apprenticeship Committee.

B. All employees must strike up and rake out their own work. The apprentice may perform this work, but in no case will he be permitted or required to rake out or strike up work done by other employees.

C. The Local Union upon the authority vested to it by the Oklahoma/Arkansas State Trowel Trades Joint Apprenticeship Committee shall have the authority to place apprentices on the jobs

-14-

**OK** 0307

12-13-06    12:28    From-IUBAC    2023930219    T-845    P.018/025    F-607

at the following ratio: first apprentice to one journeyman and thereafter, one apprentice to every one journeyman.

### ARTICLE XIII
### FOREMEN

**A.**    The salary of the Foreman shall be one extra hours pay per day.

**B.**    On all jobs the Foreman shall be a Journeyman member of the International Union of Bricklayers and Allied Craftsmen and the same branch of Trade, as the members he is Foreman over.

**C.**    On all jobs where two (2) or more members are working, one (1) must be designated as Foreman and receive Foremans pay.

**D.**    The foreman must notify this Local Union's office a minimum of eight (8) hours prior to the commencement of a job, stating job location. Contractor's Name and Job Phone Number, on those jobs lasting over three (3) days' duration.

**E.**    No member working in the capacity of Foreman may violate, or cause, or attempt to cause any employee to violate any provision of the bargaining agreement or any provision of this constitution or the International Constitution.

### ARTICLE XIX
### GRIEVANCE PROCEDURE

**A.**    The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives selected by the Contractors and two representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The Board shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and Union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

**B.**    It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

**C.**    Grievances shall be handled in the following manner:

**OR  0307**

-15-

1.  The grievance shall be referred to the jobsite Union steward and to the foreman for adjustment.

2.  If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

3.  If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4.  If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working days, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Joint Arbitration Board cannot agree on an impartial arbitrator, the impartial arbitrator shall be selected from a panel or arbitrators submitted by and in accordance with the rules and regulations of the Federal Mediation and Conciliation Service. All expenses of the Impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D.    When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provides, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E.    The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance, or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice, and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## ARTICLE XX
## SUBCONTRACTING

A.    The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

B.    All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

-16-                    *OK  0307

## ARTICLE XXI
### PRESERVATION OF WORK (ANTI - DOUBLE BREASTING)

A.    In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B.    All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XIX of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XIX is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C.    If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an aware rendered in accordance with Section B above, or to defend an action which seeks to vacate such aware, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XXII
### NO - STRIKE/NO - LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIX have been exhausted and then only in the event a party fails or refuses to abide by a final decision. this Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

## ARTICLE XXIII
### SEPARABILITY AND SAVINGS PROVISIONS

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules, and regulations made pursuant thereto. If any provision of this Agreement is held

**OK 0307**

invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is restrained by such tribunal pending a final determination as to its validity, such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this agreement shall remain in force and effect. In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate Collective Bargaining Negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law to be in effect during the period of invalidity or restraint.

**ARTICLE XXIV**
**SAFETY**

A.    **SAFETY:**

1.    The Union and the Employer agree that safety of the workplace is of paramount importance and the Employer and the Union agree to abide by all appropriate federal, state and local safety laws and regulations and any and all safety regulations established by an owner or his representative at a particular jobsite.

B.    **SAFETY AND HEALTH:**

1.    The employer suggests, and the Union totally agrees, that as soon as practical a Joint Safety Committee shall be established to educate members in the following: First aid as applicable to job site, safety in the work area, hazardous materials on masonry jobs, proper scaffold erection and safer work habits.

C.    **DRUG TESTING:**

1.    Employees shall not use, possess or have in their system alcohol or illegal drugs (as defined by Oklahoma Statutes) at any time during the workday or anywhere on the Employer's workplace. Violators will be subject to immediate discharge and, when any testing is required by the Employer, the testing program shall at all times, comply with the Oklahoma Standards for Workplace Drug and Alcohol Testing Act and any Amendments thereto (40 Okla. Stat. §551 et seq.)

2.    When testing is required by the Employer, employees shall be paid for the time necessary to take the test provided that the results of the Employee's tests are negative. No time shall be paid to an employee whose test results are positive.

3.    The Employer, and not the Union, shall be responsible for any loss, suits, actions or claims of any character by any Employee or group of Employees covered under this Agreement arising from drug, alcohol or substance impairment testing practices set forth herein.

**ARTICLE XXV**
**GENERAL UNDERSTANDING**

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and

-18-                    **OK   0307**

similarly, the Employer will at all times meet with the Union respecting any questions of misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement.

The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its employees in the bargaining unit described herein, voluntarily recognize the Union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, as amended, of all employees within that bargaining unit on all present and future job sites within the jurisdiction of the Union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

OK  0307

-19-

12-13-06    12:29    From-IUBAC                      2023930219          T-845   P.023/025   F-607

We the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to this Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

Signed this _____ day of _____, _____

FOR THE EMPLOYER                          FOR THE UNION


_____                   President/Sec-Treas.
Company Name                              Int'l Union of B.A.C
                                          Local Union No. 5 of
                                          Oklahoma/Arkansas
_____
Address


City, State and Zip Code


Phone


Fax


By
Name


Title


**˭OK  0307**

06/05/06  09:20 FAX 405 528 0165                                      ☑002

TO: Sheree                    202 638-5274        2-18-05

We the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to this Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

OK 9302
MX T
84

Signed this _____1_____ day of _April_____, 2005

FOR THE UNION

Signed this
FOR THE EMPLOYER

_President/Sec-Treas._
Int'l Union of B.A.C
Local Union No. 5 of
Oklahoma/Arkansas

_ACCENT MASONRY_
Company Name

_3700 PHILLIPS_
Address

OK 0434
OK 0907

_MOORE OK  73160_
City, State and Zip Code

_405-794-4933_
Phone

_____
Fax

By _Tom Garrett  Dale Wells_
Name

_OWNER_____
Title

OK Brick

–20–

23

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Entry of Default Judgment, with the Declaration of David F. Stupar, Declaration of Ira R. Mitzner, proposed Judgment, and Local Rule 7(k) Statement, was served by first-class mail, postage prepaid, on the 2nd day of November 2007 upon:

Accent Masonry LLC
3700 Phillips Boulevard
Moore, OK  73160

Joanne Jackson